JACQUELINE KELLEY & others[1] *vs.* CAMBRIDGE HISTORICAL
COMMISSION & others.[2]

No. 12-P-1309.

Middlesex. May 2, 2013. - August 21, 2013.

Present: MILKEY, CARHART, & SULLIVAN, JJ.

*Historic Preservation. Massachusetts Historical Commission. Real Property,*
Restrictions. *Practice, Civil,* Motion to dismiss, Complaint, Standing.
*Administrative Law,* Judicial review, Standing. *Contract,* Third party
beneficiary.

This court concluded that there was no error in the allowance by a Superior
Court judge of a motion to dismiss a civil action challenging a joint
development project proposed by the defendant developer and the defend-
ant church of property owned by the church, where the plaintiffs lacked
standing to enforce a preservation restriction the church had granted to the
Massachusetts Historical Commission [172-176]; where the plaintiffs'
failure to argue that the judge erred in ruling that G. L. c. 9, § 27C,
establishing a historic impact review process, did not apply, caused that is-
sue to be waived [176-178]; where there was no merit to the plaintiffs'
arguments concerning designated historic districts under G. L. c. 40C
[178]; where the plaintiffs' claims seeking to enforce an agreement between
the defendant city historical commission and the church were properly
dismissed [178-179]; and where the plaintiffs lacked standing to challenge
the issuance by the city historical commission of a certificate of appropriate-
ness for a modification of the project [179-181].

CIVIL ACTION commenced in the Superior Court Department on
June 13, 2011.

Motions to dismiss were heard by *Bruce R. Henry,* J.

*Elaine M. Callahan* for David Vogel, Peter Fifield, & James
J. Carr, Jr.

*David T. DeCelles* for Jacqueline Kelley.

*Timothy J. Roskelley* for Oak Tree Development, LLC, &
another.

---

[1]David Vogel, Peter Fifield, and James J. Carr, Jr.

[2]Massachusetts Historical Commission, Episcopal Diocese of Massachusetts,
and Oaktree Development, LLC.

*Arthur J. Goldberg*, Deputy City Solicitor, for Cambridge Historical Commission.

*Annapurna Balakrishna*, Assistant Attorney General, for Massachusetts Historical Commission.

MILKEY, J. The St. James Episcopal church sits at the intersection of Massachusetts Avenue and Beech Street in North Cambridge. Built in 1888, the church was designed by noted New York architect Henry M. Congdon in a style that has come to be known as "Romanesque revival." Since 1983, the church has been listed on the National Register of Historic Places, and all parties to this litigation recognize that it has significant historic value. Also at the site are a parish hall that predates the church by four years, and a small park known as "Knights garden" that was designed in 1915 by noted landscape architect John Nolen.[3]

The church property is owned by the St. James Parish (parish), which is part of the Episcopal Diocese of Massachusetts.[4] In conjunction with a private developer, the parish has proposed a four-story, mixed-use development at the church site and on an adjacent parcel that the developer owns. Under the proposal, the church itself would remain but the parish hall and Knights garden — at least in the garden's current form — would not.

The plaintiffs are four nearby residents who allege that various historic preservation laws prevent the project from going forward as proposed. Ruling that their amended complaint failed as a matter of law, a Superior Court judge allowed the defendants' motions to dismiss. We affirm the judgment, albeit on somewhat different grounds than those stated by the judge below.

*Background. The 1987 Massachusetts Historical Commission preservation restriction.* In 1987, the parish granted defendant Massachusetts Historical Commission (MHC) a preservation restriction on its land. See G. L. c. 184, § 31 (authorizing preservation restrictions). The preservation restriction, which

---

[3]A 1990 report describes Knights garden as a "grassy lot, surrounded by blooming shrubbery." The name derives from the fact that a Masonic group known as the Knights Templar helped fund the original plantings there.

[4]The diocese transferred title to the church property to the parish in 1962, although the plaintiffs allege that the parish now holds title in trust for the diocese.

was recorded in the Middlesex County registry of deeds, permanently limited the parish's development rights in certain respects. Specifically, the parish bound itself to secure prior MHC approval for all "alterations . . . to the Premises" except for certain exceptions not here relevant.[5] The express terms of the document make it plain that MHC approval is to be forthcoming only where the agency determines that the proposed alteration to the site "will not impair" "the characteristics which contribute to the architectural, archaeologic[al] or historical integrity of the Premises."[6]

*The 2005 Cambridge Historical Commission agreement.* A 1990 report prepared by staff of defendant Cambridge Historical Commission (CHC) recommended that the church be designated a historic landmark pursuant to the relevant city ordinance. The record does not explain exactly what happened to that recommendation, but the materials attached to the amended complaint indicate that the church was not designated a landmark at that time.[7]

In 2004 and 2005, the CHC again took up the question whether the church should be given landmark status, and it determined that the church met the relevant regulatory criteria. However, in consideration of the MHC preservation restriction already in place, the CHC expressly declined to designate the church a landmark. Instead, the CHC and the parish entered into a written agreement (2005 agreement) purporting to establish a "Statement of Standards . . . that should inform future alterations to the premises." That agreement noted that its "primary intent" was "to protect all publicly-visible exterior architectural features of the church structure from inappropriate alteration."[8] It further provided that "[a]ll construction on the site should preserve

---

[5] The exceptions are for "ordinary maintenance and repair," alterations that are "clearly of minor nature," and alterations "required by casualty or other emergency."

[6] The document does not contain a provision giving enforcement rights to the general public or to the plaintiffs in particular.

[7] The amended complaint treats the 1990 CHC recommendation as a landmark designation. However, it is the Cambridge city council that designates landmarks. As discussed *infra*, the city council did not designate the church a landmark until 2011.

[8] As the agreement noted, it was these exterior features that would be subject to regulation under the landmark ordinance.

open views of the church structure, should be compatible with the church, and should retain the largely free-standing character of the church on its site."

While the primary focus of the 2005 agreement was the church itself, the agreement also discussed the parish house and Knights garden. It noted that although the parish house was the oldest structure on the site, its historic significance had been substantially diminished by alterations that had been made over the years. Indeed, the 2005 agreement specifically recognized that "if at some point the church desires to construct a new parish house or other parish-related structure on the site," then "[c]onsideration should be given to allowing the removal of the parish house." With respect to Knights garden, the agreement recognized that the garden itself had historic value and it stated that "[i]nsofar as is practicable, the Garden should be maintained as a historic landscaped open space [and] [e]ncroachment on the garden should be avoided or minimized."[9]

*The development plans take shape.* In 2008, defendant Oaktree Development, LLC (Oaktree), purchased a parcel adjacent to the church property on which a car wash was located. It then approached the parish about pooling the two parcels and jointly proposing a development on them. Under Oaktree's proposal, the church itself would remain in place, but the existing parish house would be razed. A new "L-shaped" building would surround the church on two sides. Four stories in height, that building would be taller than the church except for its tower. The new building would house forty-six residential condominium units, some retail spaces, and the parish's hall. The development would displace Knights garden as such, but there would be new, publicly-accessible open space in the same general location. The plaintiffs allege that the new open space would be significantly smaller in size[10] and of a markedly different character (a mere "courtyard" or "interior plaza" sandwiched between the

---

[9]The agreement does not contain a provision giving enforcement rights to the general public or to the plaintiffs in particular.

[10]The plaintiffs allege that approximately two-thirds of the garden would be lost. Given the current posture of the case, we accept those allegations as true. However, we note that some documents attached to their complaint suggest that only about one-third of the current open space would be lost.

new building and the church, not a "garden" that served as an "oasis" from the encroaching city).

The parish eventually endorsed Oaktree's proposal and effectively became a joint developer of the project. The documents appended to the amended complaint indicate that the parish came to view the project as presenting several advantages for it. Most notably, the project would create a fund that could be used toward renovating and maintaining the church, and it would relieve the parish of its maintenance obligations for the old parish house while providing a new parish hall.

*Concern over the project's historic impacts.* The project engendered opposition from at least some of the residents in the area, and that opposition focused in part on historic impacts. Ten citizens formally petitioned the CHC to designate the church a landmark. As documented in a memorandum dated October 29, 2009, the executive director of the CHC expressed concerns about the project's historic impacts that echo those of the plaintiffs. According to him, "[t]he design [of the project] treats the church as a subsidiary building, crowds it too closely, and seriously interferes with the character of the adjoining streetscapes . . . [and] does not seem to incorporate the goals agreed to by the church in 2005." He also "expressed concern that the entire parish house would be razed and about 1/3 of the garden would be lost." His memorandum concluded by recommending that the CHC "consider whether the nature of the proposed project sufficiently honors the intent of the 2005 agreement with the church," and that "[i]f not, initiation of a landmark designation study may be warranted."

*The city's landmark designation.* Although some of the specific details are not clear, the record indicates that the CHC considered the merits of the project and whether to designate the church a landmark in tandem. At some point in that process, Oaktree and the parish offered their support for landmark designation of the church so long as their project was allowed to go forward. The CHC eventually endorsed that proposal and issued two documents to effectuate it. One was a "certificate of appropriateness," issued on November 4, 2010, that endorsed the proposed construction and demolition activities. The other was a recommendation to the Cambridge city council that landmark status

be granted to the church, subject to the project's being allowed to go forward.

On January 26, 2011, the city council held a hearing to consider the CHC's recommendation. The CHC's executive director testified at the hearing, and he explained why the CHC had come to the view that the project, on balance, was in the public interest. Specifically, he focused on the agreement by Oaktree and the church "that part of the proceeds from the project would be used to establish an endowment fund to ensure the maintenance and preservation of the church building, which is a fragile structure." Through allowing that dedicated income stream to be achieved while obtaining formal landmark status, the CHC "sought to ensure that the church would be protected for the foreseeable future." Notably, the executive director specifically acknowledged that the project would have some negative historic impacts, but stated that these would be outweighed by the availability of the new income stream. As his comments were summarized in city council minutes, he stated: "Yes, there is a loss, but it is balanced by the preservation of the church."[11]

The city council adopted the CHC's recommendation to designate the church a landmark while allowing the project to proceed. The landmark designation order recognized that the CHC had already approved the proposed demolition and construction through issuing its November 4, 2010, certificate of appropriateness.

*The modification of the project.* After the church had been designated a landmark, Oaktree proposed to modify the project by changing the location and nature of the entrance to a parking garage at the site. Oaktree characterized the modification as a "comparatively small change" that would benefit the adjacent residential area (by moving the garage entrance further away). The plaintiffs portray the changes as a "complete redesign of the Beech Street side of 'the project,' " and they allege that the

---

[11]On various grounds, the plaintiffs dispute that there is a need to sacrifice Knights garden and the parish house in order to supply some of the funding needed for repair and maintenance of the church. For example, they argue that because the parish holds title in trust for the diocese, the proper point of reference is the assets of the diocese, not the parish. In addition, the plaintiffs assert that the parish has insufficiently explored other potential funding options.

redesign will harm them in various respects discussed further, *infra.* On May 19, 2011, the CHC issued a second certificate of appropriateness approving the project as modified.

*MHC approval.* According to the amended complaint, the MHC has "issued or granted approvals" of the project. However, the complaint does not specify the form of those approvals, and no document memorializing them is before us.

*Discussion. Overview.* Before turning to the plaintiffs' individual claims, we frame the overall merits. The amended complaint is thirty-three pages long, and it incorporates several hundred pages of attachments. The complaint is written in a discursive, stream of consciousness style, it lacks any organizational coherence, and it is riddled with overblown language and inappropriate ad hominem attacks.[12] As a result, the specific legal theories on which the plaintiffs purport to rely are not readily discernible.[13] We appreciate the difficulties the motion judge faced as he diligently tried to make sense of the plaintiffs' alleged causes of action. We attempt to do the same, mindful that we should not provide the plaintiffs the undue benefit of arguments they did not fairly raise.

Given that we are reviewing the allowance of a motion to dismiss, we assume the truth of the factual allegations in the amended complaint. See *Laurano* v. *Superintendent of Schs. of Saugus,* 459 Mass. 1008, 1008 (2011). Thus, for example, we assume that the construction of the new four-story building next to the church could impair aspects of the church's historic value

---

[12]The attorney who represented all of the plaintiffs below (and three of the four plaintiffs on appeal) has been sanctioned for such conduct on previous occasions. See, e.g., *Callahan* v. *Board of Bar Overseers,* 417 Mass. 516, 520-521 (1994) (imposing double appellate costs where record was "rife with irrelevant, confusing, repetitive, and inflammatory [materials]" and counsel "set[] forth arguments on which . . . a reasonable competent attorney could not hope to prevail"); *Callahan* v. *Eastern Bank & Trust Co.,* 437 Mass. 1020, 1020 (2002), quoting from *Callahan* v. *Board of Bar Overseers, supra* at 517 (imposing double appellate costs where counsel's submissions were "convoluted, difficult to understand . . . [and] rife with the same kind of 'inflammatory and confusing accusations of conspiracy, fraud and bad faith' that [the court] previously found to be frivolous").

[13]Moreover, as set forth *infra,* additional confusion has been created by the fact that the CHC chose to pursue its historic preservation goals in part by contract (in lieu of invoking the regulatory mechanisms set forth in the relevant ordinance).

(e.g., by detrimentally affecting the visual context in which this landmarked building now will be viewed). Similarly, we assume that Knights garden has independent historical value (as the CHC and the parish both have recognized) that the project could diminish or destroy.[14]

That said, as discussed *infra*, the regulatory system depends on the relevant agencies to sort out the existence and import of any historic impacts presented, at least in the first instance. In determining whether the relevant agencies have exceeded the bounds of their authority or discretion, judges are to afford due deference to the agencies' judgment. See, e.g., *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 457 Mass. 663, 690 (2010). And judicial review is confined to matters that are properly presented. With these principles in mind, we proceed to examine each of the plaintiffs' theories, considering "whether the factual allegations in the complaint are sufficient, as a matter of law, to state a recognized cause of action or claim, and whether such allegations plausibly suggest an entitlement to relief." *Dartmouth* v. *Greater New Bedford Regional Vocational Technical High Sch. Dist.*, 461 Mass. 366, 374 (2012).

*MHC-owned preservation restriction.* As noted, the MHC owns a preservation restriction that provides it legal control over whether projects such as this go forward. To the extent that the plaintiffs seek to enforce the terms of the preservation restriction against the parish, they have not demonstrated that they have standing to do so. Cf. *Prime* v. *Zoning Bd. of Appeals of Norwell*, 42 Mass. App. Ct. 796, 803 (1997) (only holder of agricultural preservation restriction can enforce it). Although *Prime* involved an agricultural preservation restriction, not a (historic) preservation restriction, the two types of restrictions

---

[14]Before the defendants filed their motions to dismiss, the plaintiffs sought to press their case through filing an oddly styled motion seeking judicial notice of forty-three paragraphs of factual statements. The judge denied that motion, ruling that "[m]ost of these items [in the motion] do not appear to be the proper [basis] for the court to take judicial notice[; f]or the remainder[,] judicial notice is premature at this time." There was no error in that ruling. Nor did deferring such issues work any prejudice to the plaintiffs, because the plaintiffs' factual averments in their amended complaint were taken as true for purposes of considering the motions to dismiss.

are authorized by the same statutory section, see G. L. c. 184, § 31, and the plaintiffs have provided no sound reason why a different rule should apply here.[15]

There is no merit to plaintiffs' argument that their ability to enforce the terms of the preservation restriction is supplied by our recent holding in *Rosenfeld* v. *Zoning Bd. of Appeals of Mendon*, 78 Mass. App. Ct. 677, 682 (2011) ("an owner of land that adjoins the restricted land is entitled to enforce a deed restriction, whether or not the instrument imposing the restriction contains an express statement that the adjoining land is intended to benefit from the restriction") (*Rosenfeld*). *Rosenfeld* did not involve one of the restrictions recognized by G. L. c. 184, § 31, designed to serve preservation goals furthering the public interest. Instead, it involved an ordinary private deed restriction whose very purpose is to benefit adjoining property. *Rosenfeld, supra.* Moreover, *Rosenfeld* turned on a narrow question of how G. L. c. 184, § 27(*a*)(2), should be interpreted, and that section does not even apply to preservation restrictions. *Ibid.* See G. L. c. 184, § 26 (stating that preservation restrictions are not subject to § 27). Finally, although the plaintiffs allege that they own land in close vicinity to the church site, they do not allege that they own "adjoining land," so the holding of *Rosenfeld* would not actually assist them even if it applied.

Nor are the plaintiffs aided by characterizing the preservation restriction as a contract to which they are unnamed third-party beneficiaries. Nothing in the agreement evinces an intent to afford them that status. See *Cumis Ins. Soc., Inc.* v. *BJ's Wholesale Club, Inc.*, 455 Mass. 458, 466 (2009), quoting from *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366-367 (1997) ("Under Massachusetts law, a contract does not confer third-party beneficiary status unless the 'language and

---

[15]This is not to say that the difference between the two types of restrictions necessarily is immaterial with regard to who may enforce them. The current case does not present the question whether ten citizens could seek to enforce a preservation restriction pursuant to G. L. c. 214, § 7A, inserted by St. 1973, c. 1114, § 62 (authorizing citizen suits to enforce "a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment," and defining "damage to the environment" to include "destruction of . . . parks or historic districts or sites"). In any event, that statute would not assist the plaintiffs given that they number only four individuals.

circumstances of the contract' show that the parties to the contract 'clear[ly] and definite[ly]' intended the beneficiary to benefit from the promised performance'').

None of this is to say, as the defendants appear to assume, that because a third party lacks a right to enforce a government-held restriction against the owner of restricted land, that party therefore necessarily lacks a right to seek judicial review of an administrative decision made by the holder of the restriction. *Prime* v. *Zoning Bd. of Appeals of Norwell, supra,* did not address the question whether, under some circumstances, a project opponent might have an available means of seeking such review, as well as standing to do so. We need not resolve that question here either, because the amended complaint does not purport to bring such a claim. The complaint is not framed as a challenge to whatever discretionary approval the MHC may have granted pursuant to the preservation restriction. Indeed, despite its length, the amended complaint does not even identify what that approval was. Instead, arguing that the MHC is in continuing breach of a nondiscretionary duty, the plaintiffs allude to the preservation restriction in an oblique way. Specifically, they argue that by allowing the project to go forward, the MHC effectively has "released" the restriction, something that it cannot do, at least not without a public hearing. See G. L. c. 184, § 32.

MHC denies that it has released the preservation restriction, and the plaintiffs have not pointed to any MHC action that purports to do so. Therefore, plaintiffs' argument is premised on an assumption that the preservation restriction flatly prohibits a project of the sort proposed here (and that therefore the project could be approved only through the restriction's being "released"). That premise is flawed as a matter of law. The language of the preservation restriction does not flatly prohibit any particular changes to the site. Rather, it relies on case-by-case determinations by the MHC whether a particular proposal will impair "the characteristics which contribute to the architectural, archaeologic[al] or historical integrity of the Premises." Put differently, the terms of the preservation restriction leave it to the MHC to determine whether a project on balance will impair the historical value of the site. Under these circumstances, the

plaintiffs' claim that the MHC has "released" the preservation restriction fails to state a claim.

*General Laws c. 9, § 27C.* Section 27C of G. L. c. 9 creates a historic impact review process. That process, administered by the MHC, applies to projects that are initiated by State agencies, or that require State funding or "licensing."[16] G. L. c. 9, § 27C, as appearing in St. 1988, c. 254, § 7. The applicable State agency is required to notify MHC about such projects "[a]s early as possible in the planning process." *Ibid.* The MHC then has thirty days to determine whether the project "will have any adverse effect, direct or indirect, on any property listed in the state register of historic places."[17] G. L. c. 9, § 27C, inserted by St. 1988, c. 254, § 7. If the MHC makes a determination that the project will have an adverse effect, the relevant agency and the project proponent are to consult with the MHC "to discuss ways to eliminate, minimize or mitigate the adverse effects." *Ibid.*

---

[16]"License" is defined as:

"a permit determination, order or other action, including the issuance of a lease, license, permit, certificate, variance, approval, or other entitlement for use, granted to any person, firm, or corporation, including trusts, voluntary association or other forms of business organizations by a state body for a project but shall not include a general entitlement to a person to carry on a trade or profession or to operate mechanical equipment which does not depend upon the location of such trade or operation."

G. L. c. 9, § 26B, inserted by St. 1988, c. 254, § 3.

[17]"Adverse effect" is defined as:

"(1) the destruction or alteration of all or part of a site, (2) the isolation or alteration of a site's surrounding environment, (3) the introduction of visual, audible or atmospheric elements that are out of character with the site or alter its setting, (4) the neglect of a site resulting in deterioration or destruction, or (5) the transfer or sale of the site without adequate conditions or restrictions regarding preservation, maintenance or use."

G. L. c. 9, § 26B, inserted by St. 1982, c. 152, § 3. In light of this definition, the plaintiffs maintain that if the MHC is compelled to make a determination whether the project will cause "any adverse effect," it would have no choice but to find one here. We express no view on that issue, which, if applicable, would fall to the MHC to address in the first instance. However, we note that whether a project will cause "any adverse effect" within the meaning of § 27C is not necessarily the same as the test implicated by the preservation restriction.

The statute provides little specificity as to how that consultation process is to proceed, and it does not itself assign to the MHC any role in approving the project at issue. However, the statute does require the project proponent — whether public or private — to "adopt all prudent and feasible means to eliminate, minimize, or mitigate the adverse effects." *Ibid.*

The amended complaint cites extensively to the definition of "adverse effect" set forth in G. L. c. 9, § 26B. See note 17, *supra.* It references this definition primarily in trying to bolster the plaintiffs' argument as to how the preservation restriction should be interpreted. The amended complaint does not specifically allege any violation of § 27C, although it does allege — without citation or explanation — that the MHC has an obligation to make an adverse effect determination.

While noting that § 27C is "not directly referenced by the plaintiffs in their Amended Complaint," the motion judge went on to address whether it applied. He ruled that § 27C has no application here, because the plaintiffs did not allege that the project was initiated by a State agency, or was one that required State funding or approval.[18]

On appeal, the plaintiffs once again cite extensively to the definition of "adverse effect" set forth in § 26B. However, they do not argue that the judge erred in ruling that § 27C did not apply.[19] That argument therefore has been waived. We do

---

[18]The judge did not explain why the MHC approval required by the preservation restriction would not be a State "license" as that term is defined by G. L. c. 9, § 26B, and used in § 27C. See note 16, *supra.* Whether and how the § 27C process applies where the MHC itself is the licensing agency is a question that falls in the first instance to the MHC. No party to this appeal has briefed such issues, and the record includes no evidence that the MHC has even considered them. The MHC did acknowledge in its brief that "[i]f the Project involved a state actor, then the MHC would have had to hold a hearing to determine adverse effect."

[19]In their reply brief, three of the plaintiffs argue that the MHC approval under the preservation restriction is a "license" within the meaning of § 26B. However, they make no argument that this matters under § 27C, and any suggestion to that effect does not rise to the level of appellate argument required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Commonwealth* v. *Lawton*, 82 Mass. App. Ct. 528, 544 n.14 (2012). In any event, a claim of error cannot be raised for the first time in a reply brief. *Commonwealth* v. *Stewart*, 460 Mass. 817, 831 (2011).

not reach the question whether the plaintiffs otherwise would have standing to enforce that statute.

*Enforcing protections applicable to designated historic districts.* Chapter 40C of the General Laws authorizes municipalities to further historical interests by limiting development in designated historic "districts." Although the plaintiffs cite that statute throughout their amended complaint, they do not allege that any area at issue in this case was ever so designated. The plaintiffs' suggestion that the area is a "de facto Historic District" relies on a concept that the law does not recognize.

*Enforcing the 2005 agreement.* The plaintiffs also seek to enforce the terms of the 2005 agreement between the CHC and the parish. The motion judge ruled that this agreement was superseded as a matter of law by the landmark designation, which incorporated the CHC's November 4, 2010, certificate of appropriateness.

In issuing its original certificate of appropriateness on November 4, 2010, the CHC made plain its intent to allow the project to move forward so long as the church itself was given landmark status. It necessarily follows that if the 2005 agreement were viewed merely as a contract between the CHC and the parish, those parties plainly intended to abrogate that contract (at least to the extent necessary to allow the project to proceed). Nor can the plaintiffs demonstrate — as a matter of contract law — that they were specifically intended third-party beneficiaries of the 2005 agreement. See *Cumis Ins. Soc., Inc.* v. *BJ's Wholesale Club, Inc.*, 455 Mass. at 466. However, there is some force to the plaintiffs' suggestion that where, as here, a government body enters into a contract in lieu of utilizing available regulatory vehicles, such a regulatory agreement implicates more than mere contract law,[20] and the modification of such an agreement may not be immune from all judicial review. We

[20]In fact, Oaktree, the parish, and the CHC all effectively have acknowledged that the 2005 agreement has some regulatory import beyond ordinary contract law. Under the express terms of the applicable ordinance, the need for a certificate of appropriateness is triggered only as to projects that affect designated landmarks or districts. Thus, if the 2005 agreement were viewed as a mere contract, and not as a form of regulation, the parties could have amended that agreement without issuing any certificate of appropriateness (since neither landmark nor district status applied at the time). At oral argu-

need not decide whether the plaintiffs could have challenged the CHC's decision to modify the 2005 agreement, because the plaintiffs never filed a timely action seeking review of the 2010 certificate of appropriateness (the means taken by the CHC to effectuate its decision).[21] We therefore agree with the motion judge that the plaintiffs cannot seek to enforce the 2005 agreement now, regardless of whether they previously might have had standing to do so.[22] The judge properly dismissed the amended complaint to the extent it seeks to enforce the 2005 agreement.[23]

*Landmark status and the 2011 certificate of appropriateness.* The church building is now a designated landmark, but it did not achieve that status until April 4, 2011. Moreover, the landmark designation was granted subject to the project's being allowed to proceed. In other words, the project — as memorialized in the November 4, 2010, certificate of appropriateness — was excluded from the additional layer of regulation that landmark designation provides.

Once the church achieved landmark status, changes to the project potentially would be subject to CHC's landmark jurisdiction. Passing over the question whether the changes to the garage entrance in fact required additional certificate of appropriateness review,[24] we agree with the motion judge that the plaintiffs do not have standing to maintain their challenge to the May 19, 2011, certificate of appropriateness.

---

ment, Oaktree, the church, and the CHC all pointed to the 2005 agreement as the one and only source of the CHC's regulatory jurisdiction to issue the 2010 certificate of appropriateness.

[21]We discern no merit in the plaintiffs' argument that the November 4, 2010, certificate of appropriateness did not become an appealable final agency decision until the May 19, 2011, certificate was issued.

[22]The plaintiffs also argue that the 2005 agreement survives independently as a preservation restriction. However, there is nothing in the document to suggest that the parish intended to convey a property interest in the site to the CHC.

[23]We need not address the extent to which the CHC itself could have enforced the 2005 agreement.

[24]Under the express terms of the ordinance, a certificate of appropriateness is required only for an alteration that "affects exterior architectural features" of the landmarked structure. At oral argument, the developers and the CHC expressed differing views on whether the changes to the garage entrance crossed that regulatory threshold.

Although the plaintiffs do not appear to allege that they are abutters to the church site, they emphasize that their property lies in close proximity to it. However, they do not point to any applicable statute or ordinance that renders that proximity relevant for standing purposes. See, e.g., G. L. c. 40A, § 11 (conferring presumptive standing on abutters and certain others); G. L. c. 40C, §§ 5, 12A (specifying that "an owner of adjoining property" and certain others may appeal).[25] In the absence of this, their proximity to the site by itself is beside the point. See *Higgins* v. *Department of Envtl. Protection*, 64 Mass. App. Ct. 754, 757 (2005) (project opponents lacked standing even though they were abutters); *Hertz* v. *Secretary of the Executive Office of Energy & Envtl. Affairs*, 73 Mass. App. Ct. 770, 771 (2009) (same).

The plaintiffs allege that the project changes will harm them in a variety of respects: increased traffic, diminished public parking, impaired snow removal, aesthetic impacts (e.g., their having to look at a "prison wall"), and so forth.[26] Most of these alleged harms are not ones that the ordinance was enacted to protect, and hence, as a matter of law, they cannot provide standing. Cf. *Higgins* v. *Department of Envtl. Protection, supra* at 757 (diminished private views of tidelands not protected by G. L. c. 91, and thus could not provide standing to challenge decision made pursuant to that statute); *Hertz* v. *Secretary of the Executive Office of Energy & Envtl. Affairs, supra* (diminished private light, air, and views not protected by regulations, and thus could not provide standing to challenge decision made pursuant to those regulations). To the extent that the plaintiffs' alleged harm does implicate historical values that the ordinance was designed to protect, the plaintiffs cannot demonstrate that the harm they will suffer is distinct from that suffered by the

---

[25]The plaintiffs cannot rely on G. L. c. 40C, § 5, for standing as owners of property within the same historic district, because, as noted *supra*, no historic district has ever been established in the area. Nor have the plaintiffs shown that they otherwise would meet the definition of "persons aggrieved" set forth in G. L. c. 40C, § 5.

[26]In light of these allegations and the current posture of the case, we do not rely on any suggestion offered by Oaktree and the parish that the plaintiffs have no standing because the project changes are actually in their favor.

public at large.[27] *Higgins* v. *Department of Envtl. Protection, supra* at 758.

As the Supreme Judicial Court has recognized, a "usual[]" prerequisite to standing is that the government entity "owe[d] a duty directly to the plaintiffs." *Enos* v. *Secretary of Envtl. Affairs,* 432 Mass. 132, 136 (2000). See *Hertz* v. *Secretary of the Executive Office of Energy & Envtl. Affairs, supra* at 771-774 (opponents to a project lacked standing to challenge an approval of a municipal harbor plan that allowed the project to go forward, where the regulation at issue did not afford them any special status different from the public at large). The same principle applies here. In the end, the plaintiffs have not pointed to anything in the relevant ordinance that confers special rights on those located in the vicinity of a landmark. See Cambridge City Code c. 2.78.240 (2012). In fact, far from recognizing such rights, the ordinance here states that only an applicant has a right to challenge a determination made by the CHC regarding a certificate of appropriateness.[28] *Id.* We agree with the motion judge that the plaintiffs lack standing to challenge the May 19, 2011, certificate of appropriateness.

*Conclusion.* The claims that are properly before us fail as a matter of law. To the extent that the amended complaint adumbrates any additional claims, the plaintiffs have not preserved

---

[27]To the extent the plaintiffs argue that the project changes will diminish the historic value of their own homes, such interests are not protected under the ordinance since the homes have not been landmarked and do not lie in any designated historic district. With regard to the plaintiffs' allegations that they themselves have long used Knights garden and the project will prevent them from pursuing that interest, such harm — whether legally cognizable or not — has nothing to do with the post-landmark modifications to the project.

[28]After concluding that the plaintiffs did not fall within the categories of parties to whom the ordinance provided an express right of appeal, the motion judge ended his analysis of the standing question. Compare *Springfield Preservation Trust, Inc.* v. *Springfield Historical Commn.,* 380 Mass. 159, 160-161 (1980). Under particular circumstances, a party might be able to demonstrate standing to challenge a municipal decision regardless of whether the relevant ordinance or by-law affirmatively recognized that right. Cf. *Friedman* v. *Conservation Commn. of Edgartown,* 62 Mass. App. Ct. 539, 542 (2004) (action in nature of certiorari may be available to correct local agency action in absence of other path of review). A municipality does not necessarily get the final word regarding who can seek judicial review of its regulatory decisions.

those claims through adequate appellate argument.[29] See *Commonwealth v. Gray*, 423 Mass. 293, 296-297 (1996) (claims of error "not supported by reasoned argument or citations . . . do not rise to the level of appellate advocacy required under Mass. R.A.P. 16[a][4]").

*Judgment affirmed.*

---

[29] Arguing that the plaintiffs' appeal was frivolous, Oaktree and the parish have requested that we grant them double costs and attorney's fees pursuant to G. L. c. 211A, § 15, and Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979). They argue that sanctions are especially appropriate in light of the plaintiffs' lead counsel's documented history of bringing questionable appeals. See note 12, *supra*. There is some force to such arguments. However, we decline to levy sanctions after considering all relevant factors. In particular, we conclude that the central problem here is that counsel were ineffective in focusing their clients' claims and arguments, not that counsel pressed an inherently frivolous appeal. See *Marabello v. Boston Bark Corp.*, 463 Mass. 394, 400 (2012).